No. 25-1318

*In the*

# United States Court of Appeals
### *for the*
# Fourth Circuit

BRITTANY RUFFIN, individually and as
Personal Representative for the Estate of J.R.,
*Plaintiff-Appellee,*

– v. –

KEVIN DAVIS,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of South Carolina
Case No. 3:23-cv-1425-SAL-PJG
Hon. Sherri A. Lydon, *United States District Judge*

## BRIEF FOR APPELLEE

| | |
|---|---|
| JUSTIN T. BAMBERG | PAUL W. HUGHES |
| ADAM C. NESS | MARY H. SCHNOOR |
| *Bamberg Legal, LLC* | *McDermott Will & Schulte LLP* |
| *104 Bridge Street* | *500 North Capitol Street NW* |
| *Bamberg, SC 29003* | *Washington, DC 20001* |
| *(803) 956-5088* | *(202) 756-8000* |

*Counsel for Plaintiff-Appellee Brittany Ruffin, individually and as
Personal Representative for the Estate of J.R.*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1318__      Caption: __Brittany Ruffin et al v. Kevin David, et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Brittany Ruffin, individually, and as PR for the Estate of JR__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                              ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:
       n/a

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                              ☐YES ☑NO
      If yes, identify all such owners:
       n/a

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

n/a

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

n/a

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

n/a

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

n/a

Signature: s/ Adam C. Ness          Date: April 4, 2025

Counsel for: Appellee

Print to PDF for Filing

ii

# TABLE OF CONTENTS

Disclosure Statement ....................................................................................i

Table of Authorities....................................................................................iv

Introduction ................................................................................................1

Jurisdiction .................................................................................................3

Statement of the Issues...............................................................................4

Statement of the Case .................................................................................4

    A.   Factual background..........................................................................4

    B.   Procedural background ...................................................................8

Summary of Argument..............................................................................16

Argument ..................................................................................................18

I.   The Court lacks jurisdiction over Davis's appellate arguments.........19

    A.   The Court lacks jurisdiction to review the district court's
determination that genuine issues of fact are in dispute. ...........19

    B.   Davis's arguments on appeal necessarily disagree with the
district court's determination that there is a genuine
dispute as to whether J.R. made any threatening
movements. ...................................................................................20

II.   The district court properly denied qualified immunity.......................23

    A.   Davis's objectively unreasonable use of deadly force violated
J.R.'s Fourth Amendment right....................................................24

    B.   The constitutional right was clearly established. ........................37

Conclusion.................................................................................................41

# TABLE OF AUTHORITIES

Page

**Cases**

*Aleman v. City of Charlotte*,
80 F.4th 264 (4th Cir. 2023)..........................................................*passim*

*Anderson v. Russell*,
247 F.3d 125 (4th Cir. 2001) ...................................................................31

*Estate of Armstrong v. Vill. of Pinehurst*,
810 F.3d 892 (4th Cir. 2016) ...................................................................37

*Barnes v. Felix*,
145 S. Ct. 1353 (2025) .............................................................................36

*Benton v. Layton*,
139 F.4th 281 (4th Cir. 2025)......................................................29, 30, 41

*Betton v. Belue*,
942 F.3d 184 (4th Cir. 2019) .......................................................26, 27, 38

*Cole v. Carson*,
935 F.3d 444 (5th Cir. 2019) (en banc)...............................................26, 39

*Cole v. Hutchins*,
959 F.3d 1127 (8th Cir. 2020) ...........................................................26, 39

*Cooper v. Sheehan*,
735 F.3d 153 (4th Cir. 2013) ....................................... 25, 27, 30, 38

*Franklin v. City of Charlotte*,
64 F.4th 519 (4th Cir. 2023)..................................................*passim*

*George v. Morris*,
736 F.3d 829 (9th Cir. 2013) .............................................................26, 39

*Graham v. Connor*,
490 U.S. 386 (1989): ....................................................................*passim*

*Henry v. Purnell*,
652 F.3d 524 (4th Cir. 2011) ...........................................................*passim*

*Hensley v. Price*,
876 F.3d 573 (4th Cir. 2017) ...........................................................*passim*

*Hicks v. Ferreyra*,
965 F.3d 302 (4th Cir. 2020) ................................................ 3, 19, 20, 21

Cases—continued

*Johnson v. Jones*,
515 U.S. 304 (1995) ......................................................................3, 19

*Elliott v. Leavitt*,
99 F.3d 640 (4th Cir. 1996) .......................................................31

*Estate of Jones v. City of Martinsburg, W. Va.*,
961 F.3d 661 (4th Cir. 2020) ...............................................16, 38

*Knibbs v. Momphard*,
30 F.4th 200 (4th Cir. 2022)..................................................*passim*

*Lewis v. Caraballo*,
98 F.4th 521 (4th Cir. 2024)..................................................*passim*

*McMellon v. United States*,
387 F.3d 329 (4th Cir. 2004) .....................................................24

*Mitchell v. Forsyth*,
472 U.S. 511 (1985) .......................................................................3

*Mullenix v. Luna*,
577 U.S. 7 (2015) .........................................................................37

*Scott v. Harris*,
550 U.S. 372 (2007) ....................................................................20

*Slattery v. Rizzo*,
939 F.2d 213 (4th Cir. 1991) ...............................................30, 31

*Smith v. Ray*,
781 F.3d 95 (4th Cir. 2015) ..............................................*passim*

*Stanton v. Elliott*,
25 F.4th 227 (4th Cir. 2022)................................................13, 38

*State v. McGowan*,
557 S.E.2d 657 (S.C. 2001)................................................27, 35

*Tarashuk v. Givens*,
53 F.4th 154 (4th Cir. 2022).................................................37, 40

*Tennessee v. Garner*,
471 U.S. 1 (1985) ..................................................................*passim*

*Thomas v. City of Columbus, Ohio*
854 F.3d 361 (6th Cir. 2017) ....................................................32

Cases—continued

*Thornton v. City of Columbus*,
727 F. App'x 829 (6th Cir. 2018)................................................................32

*Waterman v. Batton*,
393 F.3d 471 (4th Cir. 2005) ..............................................................4, 18

*Williams v. Strickland*,
917 F.3d 763 (4th Cir. 2019) ..............................................................3, 20

*U.S. ex rel. Wright v. Cuyler*,
563 F.2d 627 (3d Cir. 1997)................................................................34

*Yates v. Terry*,
817 F.3d 877 (4th Cir. 2016)................................................................24

**Statutes**

28 U.S.C.
§ 1331 .........................................................................................................3
§ 1343 .........................................................................................................3

42 U.S.C.
§ 1983 ...........................................................................................1, 3, 8, 24

S.C. Code Ann.
§ 16-7-10 ..................................................................................................35
§ 16-21-90 ................................................................................................34
§ 16-23-20 ................................................................................................35
§ 16-23-420(B) ........................................................................................34

**Other Authorities**

U.S. Const. amend. IV..........................................................................*passim*

U.S. Const. amend. V ..................................................................................10

Fed. R. Civ. Proc. 56(a)................................................................................18

# INTRODUCTION

This case concerns the fatal shooting of J.R., a high school senior, by a City of Columbia police officer—the tragic culmination of a police-citizen encounter that was unreasonable from start to finish.

In April 2020, during the early days of the COVID-19 pandemic, Officer Kevin Davis responded to a report of teenagers on bicycles looking into cars. He spotted J.R. walking alone down a sidewalk, no bicycle in sight. Davis nonetheless jumped out of his patrol vehicle and rushed toward J.R., who fled in fear. The foot chase led to the deserted parking lot of J.R.'s high school. As he ran up an embankment heading into the parking lot, J.R. slipped, and the pistol he had been carrying for self-defense either in his shoulder bag or on his person fell out. J.R. picked up the gun and continued to flee. Davis, seeing the gun, immediately began to fire at J.R. while giving commands for J.R. to show his hands and "get on the ground." Davis rapidly fired nine times at J.R., who never raised his gun or did anything other than look behind him as he ran away. During this backward glance, one of Davis's bullets hit J.R. in the forehead and killed him.

Plaintiff, J.R.'s mother, brought an excessive force claim against Davis under 42 U.S.C. § 1983. The district court denied Davis's motion for summary judgment based on qualified immunity, finding that a jury could conclude from the record evidence that a reasonable officer in Davis's position

would not have believed J.R. to pose an immediate threat. This interlocutory appeal follows. The question before this Court is therefore straightforward: taking the facts as the district court gave them, viewed in the light most favorable to Plaintiff, did Davis violate clearly established law prohibiting deadly force against an armed individual who poses no immediate threat?

Rather than address that legal question, Davis's brief impermissibly quarrels with the district court's factual findings. This Court lacks jurisdiction to review the district court's determination that a genuine dispute of material fact exists as to whether J.R. made any threatening movements or to reassess the district court's view of the record evidence.

To the extent the Court has jurisdiction over any of the arguments in Davis's brief, they are unavailing. This Court's binding case law clearly establishes that deadly force cannot be used against an individual who is armed but has not pointed the weapon or otherwise made a furtive or threatening movement. Other circuits are in accord. Any reasonable officer in Davis's shoes therefore would have been on notice that shooting J.R., without warning, as he ran *away* from Davis and posed no immediate threat to Davis or anyone else, was excessive force.

The Court should dismiss Davis's jurisdictionally barred arguments and otherwise affirm the district court's order denying qualified immunity.

## JURISDICTION

Plaintiff asserted claims under 42 U.S.C. § 1983 against Davis and the other defendants. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. Davis moved for summary judgment on the ground of qualified immunity. JA071. The district court denied summary judgment on Plaintiff's Fourth Amendment excessive force claim, holding that Davis was not entitled to qualified immunity as a matter of law. JA380-381.

This Court has jurisdiction to review "a district court's denial of a claim of qualified immunity" at summary judgment solely "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (quotation marks omitted). In such interlocutory appeals, this Court's jurisdiction is thus "'limited to one narrow legal question: *if we take the facts as the district court gives them to us*, and we view those facts in the light most favorable to the plaintiff,' are the defendant officers 'still entitled to qualified immunity?'" *Hicks v. Ferreyra*, 965 F.3d 302, 309 (4th Cir. 2020) (quoting *Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019)). There is no jurisdiction to review the "district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-320 (1995); *see also Hicks*, 965 F.3d at 312-313; *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015) ("[T]he conclusion of the district court that a disputed issue of fact

exists as to a particular point is not appealable under the collateral order doctrine.").

## STATEMENT OF THE ISSUES

1. Whether this Court lacks jurisdiction over Davis's appellate arguments because they necessarily disagree with the district court's conclusion that the record sets forth a genuine dispute of material fact as to whether J.R. made any movements that could reasonably be perceived as threatening.

2. In the alternative, whether there is clearly established law that using deadly force against an individual who, although armed, has not made a threatening movement is unconstitutional excessive force.

## STATEMENT OF THE CASE

We draw the facts from those "the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff," which this Court must "accept as true" "[i]n reviewing the denial of summary judgment based on qualified immunity." *Smith*, 781 F.3d at 98 (quoting *Waterman v. Batton*, 393 F.3d 471, 473 (4th Cir. 2005)).

### A.     Factual background

**1.** On April 8, 2020, around 6 p.m., Davis, a police officer with the City of Columbia Police Department, received a text message from Dylan Gunnels, president of a local neighborhood association, stating that Gunnels had received reports of teenagers riding bikes and looking in cars. JA364;

JA119-120. In response, Davis went to patrol the neighborhood. JA365. He was alone, in uniform, drove his marked patrol vehicle, and carried his duty firearm. *Id.*

When Davis arrived at the neighborhood, he observed J.R. walking down a sidewalk. JA365; JA214. J.R. was walking to his father's house after having just cashed his paycheck from his job at McDonald's. JA309; JA230. According to a written statement Davis subsequently provided, he saw J.R. step behind a house and reappear with a bag. JA365. As plaintiff's evidence shows, though, the bag in question belonged to J.R.—it had been a gift from his mother—and was with him the entire time. JA365; JA218; JA230. Plaintiff contends that Davis lacked reasonable suspicion to stop J.R., as he did not fit the description from Gunnels's complaint, and that Davis's account about J.R. reappearing from behind a house with a bag was fabricated "to cover the fact that he racially profiled [J.R.], pulled up behind him, and jumped out of his squad car in hopes that he would scare [J.R.] into running." JA309 (quoting JA219).

As Davis approached J.R. in his patrol vehicle, J.R. walked away from him. JA365. Davis then exited his patrol car and immediately rushed toward J.R., who took off running away from him. *Id.*; JA127 at 00:00–00:05.[1]

---

[1] Davis's body-worn camera recorded audio and partial video of the events, starting when Davis exited his patrol car. JA127. Additionally, video surveillance from Eau Claire High School captured portions of the incident

J.R., a high school track athlete, outran than Davis, and the distance between them quickly widened as J.R. ignored multiple commands to "stop running." JA365; JA014; JA127 at 00:00–00:22.

**2.** The foot chase led across Columbia College Drive and into a driveway leading to a parking lot at Eau Claire High School, the school J.R. attended. JA127 at 00:17–00:28, JA076. The video evidence shows that the parking lot was empty, it being early in the COVID-19 pandemic. JA150 at 03:00–03:45. When J.R. reached the driveway, he slipped and momentarily appeared to be in a crouched position, at which point Davis yelled at him to "get on the ground" and unholstered his firearm. JA309; JA129 at 00:25–00:32, JA150 at 3:26–3:33. At this time, Davis was within 30 feet of J.R. JA015. As J.R. stood back up and continued running away, he held a pistol, which he had previously been carrying on his person or in his bag for self-defense. JA309; JA366; JA129 at 00:32–00:35.[2]

Seeing the gun, Davis began to fire at J.R. while giving commands for J.R. to show his hands and "get on the ground." JA370-371; JA309; JA129

without audio. JA150. The district court rejected Davis's arguments that still shots from the relevant video footage, viewed in the light most favorable to Plaintiff, indicate any "furtive movements" by J.R. JA376; *see also* JA325-326 (magistrate judge's description of the videos).

[2] It is understandable that J.R. felt a need to carry a gun for protection, not only because of the high levels of violent crime in Columbia (JA309) but also because he was carrying $144 in cash (JA266-267), having just cashed his paycheck (JA230).

at 00:28–00:30. J.R. continued to flee across the high school parking lot (JA150 at 03:30–03:38), and it is undisputed that J.R. never fired his weapon. JA374; JA309. Over the next approximately ten seconds, Davis fired a total of nine times at J.R. as he attempted to flee. JA374; JA129 at 00:29–00:39. In this time, J.R. managed to increase the distance between himself and Davis to approximately 90-110 feet. JA018. Davis ultimately shot J.R. in the forehead, killing him, as J.R. attempted to look back at Davis while running away. JA309; JA379.

**3.** Six days later, on April 14, 2020, Davis provided a written statement to the South Carolina Law Enforcement Division ("SLED"). JA098-105. In that statement, he offered the following account of the moment leading up to his fatal shooting of J.R.:

> I do not recall the exact details of what occurred after I saw the suspect crouch down. But to the best of my knowledge my next recollection after that point was hearing gunshots, and seeing the suspect running perpendicular of my location west alongside the side of the Eau Claire High School. I observed the suspect to have possession of a black pistol in his hand, I was in fear for my life. I believe I gave the suspect commands to drop his gun at this point, although I am unsure of the exact timing of these commands, and it happened so quickly I am unsure if I was able to actually give them.

> I observed the suspect turn his head towards me, in what I believed was an attempt to turn his body towards me and raise the firearm (black pistol with a brown handle) to be at a position to fire towards me, fearing for my life and to defend myself from great bodily injury or death, I gained my sight picture of my pistol and fired approximately four (4) shots towards the suspect. I

7

then observed the suspect fall to the ground, and I could see 1 wound to the front of the suspect's forehead.

JA366; JA104. Davis did not state that J.R. ever pointed the pistol at him. The audio from Davis's body-worn camera proves that he did not, in fact, ever order J.R. to drop the gun. JA328; JA129 at 00:28–00:39. And forensic evidence shows that J.R. never fired his gun; the only gunshots Davis heard were his own. JA328; JA374.

### B. Procedural background

**1.** Plaintiff Brittany Ruffin, individually and as personal representative for J.R.'s estate, sued Davis under Section 1983 alleging, among other claims, excessive force in violation of the Fourth Amendment.[3]

Davis moved for summary judgment on the ground that he was entitled to qualified immunity. JA071. Contending that still shots from the video show J.R. "point[ing]" and "aiming" his gun at Davis (JA078, JA080), Davis argued that "his actions were objectively reasonable when the suspect ignored multiple police commands, continually evaded arrest, pointed a weapon at the officer within firing range, and turned to face the officer to

---

[3] Plaintiff's complaint also brought claims against other defendants whose dismissal has since been stipulated. JA310. The other defendants were William Holbrook, both individually and in his capacity as the Chief of Police, the City of Columbia Police Department, and the City of Columbia. JA010-011.

gain a sight." JA084; *see also, e.g.*, JA093 ("Davis did not draw his weapon and shoot until he witnessed the suspect point a gun at him.").

In opposition, Plaintiff argued that competing interpretations of the record evidence—and in particular the video evidence—gave rise to a genuine dispute of material fact that precluded summary judgment. JA208. Indeed, the evidence, viewed in the light most favorable to Plaintiff, supported the conclusion that J.R. *did not* point a weapon at Davis, *did not* raise his weapon in a firing position while running, and *did not* turn to face Davis "to gain a sight," as Davis argued, but rather "looked back … to see where his attacker was standing" while running away from Davis, the aggressor. JA212; JA226.

In reply, Davis contended that the record was clear that Davis faced an immediate threat justifying his use of deadly force and that the facts disputed by Plaintiff were immaterial. JA235. Although Davis's reply retreated from his prior assertion that there is record evidence of J.R. pointing or aiming the gun at Davis (JA235-236), it contended that the still shots from the video show J.R.'s "hand go[] up with the weapon making the furtive movement that put the officer in fear for his life" (JA236). Davis further argued, for the first time, that his use of deadly force did not violate clearly established constitutional law. JA239-240.

**2.** The magistrate judge recommended denial of Davis's motion for summary judgment in relevant part.[4] JA329. Viewing the record in the light most favorable to Plaintiff, the magistrate judge analyzed the legal question of whether Davis's use of deadly force was reasonable by considering the three factors derived from *Tennessee v. Garner*, 471 U.S. 1 (1985), and articulated in *Graham v. Connor*, 490 U.S. 386, 396 (1989): (1) the severity of the crime being investigated, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. JA320. In so doing, the magistrate judge recognized that, under this Circuit's case law, the second factor is the most important. *Id.* (citing *Lewis v. Caraballo*, 98 F.4th 521, 531 (4th Cir. 2024)).

The magistrate judge concluded that the question "whether Davis's force was excessive" necessarily turned on the second *Graham* factor because the first factor was "not germane" to the analysis and the third factor weighed in Davis's favor. JA322-323. With respect to the first *Graham* factor, the magistrate judge reasoned that Davis's use of force was "unrelated to" the suspected property crimes that brought Davis to the neighborhood. JA322 (citing *Knibbs v. Momphard*, 30 F.4th 200, 215 (4th Cir. 2022)). And

---

[4] The magistrate judge recommended that the district court grant Davis's motion for summary judgment on Plaintiff's claims for deliberate indifference and violation of the Fifth Amendment. JA330-331.

the third *Graham* factor weighed in Davis's favor because it was undisputed that J.R. "attempted to evade by flight and disobeyed Davis's commands." JA322-323.

Turning to the second *Graham* factor—whether J.R. posed an immediate threat to the safety of Davis or others—the magistrate judge recognized that the parties "vigorously dispute J.R.'s movement" in the moments before Davis killed him: "Davis argues J.R. crouched, armed himself, and pointed a gun at him. On the other hand, Plaintiff argues J.R. slipped while possessing a gun, picked it up from the ground, never pointed the gun at Davis, and continued running away." JA324.

The magistrate judge found that Davis's SLED statement was "ambiguous beyond the moment Davis says he saw J.R. crouch," and concluded that such ambiguities must be resolved in Plaintiff's favor at the summary judgment stage. JA325. The magistrate judge noted that "in use of deadly force cases like this one[,] because [the officer] has killed the only other potential witness that can directly refute his account of what happened," the court must "avoid simply accepting [Davis's] self-serving statements and … consider all contradictory evidence." JA327-328 (quoting *Knibbs,* 30 F.4th at 216). The magistrate judge also found that "[i]t is difficult to discern J.R.'s movement from either video." JA325. The Eau Claire High School surveillance video has a "viewer's perspective [that] is far away, the frame rate is

low, and there is no audio." *Id.* The magistrate judge determined that this video "is capable of more than one interpretation and does not meet the high standard to utterly discredit Plaintiff's account." JA325-326. As for the body-worn camera video, although it is "closer in proximity than the surveillance video" and includes audio, "the video is shaky, … J.R. is too far away to discern his movements while bent over," and "during Davis's continued use of force, J.R. is out of frame." JA326. The magistrate judge also found that the body-worn camera video "does not clearly show the weapon at issue or it being aimed in any particular direction." *Id.* In all, the magistrate judge determined, neither video discredited Plaintiff's assertion that J.R. never pointed the gun at Davis.

The magistrate judge recognized that an individual could pose an immediate threat to a reasonable officer even if he did not point a gun at the officer, depending on his "movement with a gun." JA326-327. Here, however, the record—viewed in the light most favorable to Plaintiff—could support a finding that J.R. was "fleeing in fear," that "[d]uring flight, he tripped and his gun fell," and that "J.R. picked [the gun] up [but] … never pointed a gun at Davis, never returned fire, [and] never presented a threat." JA328. The magistrate judge concluded that "[i]f Plaintiff's evidence is believed by a jury (based on its own weight or in conjunction with [Davis's] potential credibility issue …), this would be a violation of the Fourth Amendment."

*Id.* On the record presented, the magistrate judge therefore rejected Davis's argument that "as a matter of law[, … ] Davis had a reasonabl[e] objective basis to believe J.R. was an immediate threat to [Davis] or others." JA329.

The magistrate judge further found that Davis failed to meet his burden to establish that the alleged constitutional violation was not clearly established at the time of the incident. JA329 (quoting *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022)). The magistrate judge reasoned that Davis's only argument on this prong wrongly assumed that Plaintiff, not he, bore the burden of proof. *Id.* Moreover, "assuming a jury found J.R. was not an immediate threat," his right against excessive force "was clearly established well before the time of this incident" by, among other cases, *Henry v. Purnell*, 652 F.3d 524, 531-532 (4th Cir. 2011) (en banc). JA329.

The magistrate judge therefore recommended denial of Davis's motion for summary judgment on Plaintiff's Fourth Amendment excessive force claim.

**3.** The district court overruled Davis's objections to the magistrate judge's recommendation and adopted the report. JA369-381.

The district court first observed that the record establishes "three undisputed facts": (1) J.R. possessed a firearm; (2) J.R. ignored Davis's repeated commands to stop running, get on the ground, and show his hands; and (3) J.R. turned his head toward Davis in the final moments of the chase,

as shown by the fact that he was shot in the forehead. JA370. Beyond that, the district court recognized, "key factual disputes remain, with each party offering conflicting interpretations of the evidence." *Id.* In particular, the district court noted, "while it is undisputed that J.R. turned his head, there is no *undisputed evidence* that he made a furtive or threatening movement with the weapon." JA371.

The district court then turned to Davis's four objections and overruled each in turn.

*First*, in response to Davis's objection that the magistrate judge relied on "Plaintiff's unverified allegations or the conjecture of her counsel," the district court found that the magistrate judge correctly determined that a genuine dispute of material fact existed. JA371-372.

*Second*, the district court disagreed with Davis's arguments that this Court's analysis in *Knibbs* could not "inform the court's analysis in this case" and found appropriate the magistrate judge's use of *Knibbs*. JA372-374. The district court further observed that every case cited by Davis in his objection to the magistrate judge's recommendation involved "*undisputed evidence*" that "suspects made explicit threatening movements"—and that here, by contrast, there was no undisputed evidence that J.R. did so. JA375.

*Third*, the district court disagreed with Davis's argument that the magistrate judge improperly relied on hindsight rather than evaluating the

14

situation from the perspective of an objectively reasonable officer on the scene. JA376. Davis contended, based on his SLED statement, the still shots from the video footage, and the undisputed facts that J.R. ran from Davis, was armed, ignored commands to stop, and turned his head toward Davis, that an objectively reasonable officer on the scene would have believed J.R. to pose an immediate threat to his safety. *Id.* In rejecting this argument, the district court reasoned that the magistrate judge did not ignore or dismiss the evidence or undisputed facts, but "correctly found that, taking this evidence in [the] light most favorable to Plaintiff, a reasonable jury could conclude that a reasonable officer in Davis's place would not have believed J.R. to pose an immediate threat to his safety." *Id.* In particular, the district court disagreed that "turning one's head while running" was a "threatening movement sufficient to justify the use of deadly force." JA379.

*Finally*, the district court overruled Davis's objection that he was entitled to qualified immunity because the case law did not clearly establish a right to be free from deadly force under the circumstances of this case "because this objection is based on Davis's incorrect assertion that the undisputed evidence shows J.R. raised his firing arm at Davis." JA379. Noting that, under Fourth Circuit precedent, it was Davis's burden to establish that the constitutional violation was not clearly established at the time of the

15

incident, the district court explained that the cases Davis cited were all distinguishable as involving suspects who made a "threatening movement" with a weapon. JA380. The district court also recognized that this Court has specifically held that "simply being armed is insufficient to justify deadly force" and has stated that "shooting a fleeing, nonthreatening misdemeanant was unlawful, even when the suspect had a firearm." *Id.* (quoting *Estate of Jones v. City of Martinsburg, W. Va.*, 961 F.3d 661, 670 (4th Cir. 2020)).

Davis filed this interlocutory appeal.

## SUMMARY OF ARGUMENT

The district court correctly rejected Davis's qualified-immunity defense at summary judgment.

**I.** The Court lacks jurisdiction over Davis's arguments on appeal because they all are premised on a disagreement with the district court's assessment of the record.

**A.** Because this is an interlocutory appeal from the denial of qualified immunity, this Court lacks jurisdiction to review the district court's assessment of the record evidence or its conclusion that a jury could reasonably conclude from that evidence that J.R. did not make a furtive or threatening movement with the gun.

**B.** All of Davis's arguments on appeal are premised on a misstatement of the facts as the district court gave them: that J.R. deliberately

crouched down while holding a gun and, while crouching, turned to look back at Davis. This interpretation of the record cannot be squared with the district court's. Davis nowhere argues that he is still entitled to qualified immunity as a matter of law on the facts as the district court gave them, viewed in the light most favorable to Plaintiff: that, even if J.R. slipped as he ran away in fear from Davis's unwarranted pursuit, never pointed a gun at Davis, never made any threatening or furtive movement with the gun, and merely turned his head to look behind him as he continued to flee, Davis was nonetheless entitled to qualified immunity for his use of deadly force.

**II.** Davis was not entitled to qualified immunity because his use of deadly force was excessive and violated clearly established law providing that deadly force cannot be used against an individual who, although armed, does not pose an "immediate threat" to the officer or others.

**A.** Davis's use of deadly force was objectively unreasonable under *Graham* and *Garner*. Taking the record in the light most favorable to Plaintiff, a reasonable officer could not have believed that J.R. was an immediate threat to Davis or others. J.R. was *running away* from Davis, who had aggressively initiated the encounter without any reasonable suspicion of wrongdoing, nobody else was around, and J.R. had not pointed the gun or made any sort of furtive or threatening movement with it. There was no threat whatsoever that would have justified the use of deadly force. The

other relevant factors either weigh in Plaintiff's favor or do not move the needle.

**B.** Davis's use of deadly force violated clearly established law, from both this Court and other circuits, prohibiting the use of deadly force against an individual who is armed but has not pointed the weapon or otherwise made a furtive or threatening movement. Davis has presented no substantial argument to the contrary, either in the district court or on appeal.

## ARGUMENT

This Court reviews de novo a district court's decision to deny a summary judgment motion asserting qualified immunity. *See Smith*, 781 F.3d at 100. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).

"In reviewing the denial of summary judgment based on qualified immunity, we accept as true the facts that the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff." *Smith*, 781 F.3d at 98 (quoting *Waterman*, 393 F.3d at 473). "To the extent that the district court has not fully set forth the facts on which its decision is based, we assume the facts that may reasonably be

inferred from the record when viewed in the light most favorable to the plaintiff." *Id.*

## I. THE COURT LACKS JURISDICTION OVER DAVIS'S APPELLATE ARGUMENTS.

Davis's entire appeal is premised on his disagreement with the district court's finding that there is genuinely disputed record evidence as to whether J.R. made a threatening movement. Because this Court lacks jurisdiction to consider such arguments, it should simply dismiss this appeal.

### A. The Court lacks jurisdiction to review the district court's determination that genuine issues of fact are in dispute.

Because this is an interlocutory appeal from the district court's denial of qualified immunity, the Court lacks jurisdiction to review the "district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson*, 515 U.S. at 319-320; *see also Hicks*, 965 F.3d at 312-313; *Smith*, 781 F.3d at 100 ("[T]he conclusion of the district court that a disputed issue of fact exists as to a particular point is not appealable under the collateral order doctrine."). In this procedural posture, the Court "do[es] not weigh the evidence, credit the movant's evidence, make credibility determinations, or decide whether the evidence is sufficient to permit a particular finding of fact." *Lewis v. Caraballo*, 98 F.4th 521, 528 (4th Cir. 2024). Instead, the

Court must *"take the facts as the district court gives them." Hicks*, 965 F.3d at 309 (quoting *Williams*, 917 F.3d at 768).

The "one narrow exception" to this jurisdictional limitation is when "the district court's factual findings … are 'blatantly contradicted by the record.'" *Lewis*, 98 F.4th at 529 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Davis rightly does not invoke that exception in this case. *See generally* Br. 6-24.

The Court therefore lacks jurisdiction over arguments that necessarily take issue with the district court's "assessment of the factual record." *Hicks*, 965 F.3d at 305 (dismissing portions of officers' appeal that argued the district court erred in denying summary judgment based on qualified immunity where officers' argument rested on "instances in which they believe the district court misconstrued the record evidence").

**B. Davis's arguments on appeal necessarily disagree with the district court's determination that there is a genuine dispute as to whether J.R. made any threatening movements.**

Davis's arguments on appeal all start from the false proposition that it is "undisputed" that J.R. "placed [a firearm] in his hand as he crouched down and faced [Davis]." Br. 6; *see also id.* at 18 (on the first *Graham* factor, contending that "J.R. was in a crouching position, had turned his head towards Officer Davis, and held a handgun"); *id.* at 22 (on the second *Graham* factor, contending that J.R. was an immediate threat because "J.R. …

placed a handgun visibly in his right hand, crouched behind a bush, and looked in Officer Davis's direction"); *id.* at 22-23 (on the third *Graham* factor, contending that "[a]lthough J.R. stopped running, it was only to crouch, with full control of the gun in hand, to look at Officer Davis"); *id.* at 24 (contending that Davis is entitled to qualified immunity under the "clearly established right" prong because "Officer Davis objectively perceived an immediate danger when J.R. failed to follow his clear commands, was visibly holding a handgun firmly in his control, crouched down and turned his head towards Officer Davis"). That proposition misstates the facts as the district court gave them—namely, that a reasonable jury could find that J.R. slipped, as opposed to deliberately crouching, and made *no* movement that could reasonably be perceived as threatening. Davis's arguments thus amount to no more than a quarrel with the district court's assessment of the factual record. This Court lacks jurisdiction over such contentions. *See Hicks*, 965 F.3d at 305.

The district court clearly stated that "key factual disputes" gave rise to genuine issues of material fact that precluded summary judgment. JA371-372. In particular, "the evidence concerning J.R.'s movements at the relevant moment is … ambiguous and must be resolved in Plaintiff's favor." JA375. One dispute concerns what happened when J.R.'s gun first appeared: While Davis argued that J.R. "became an immediate threat by

crouching" while holding a gun (JA323), Plaintiff argued that "J.R. slipped while possessing a gun, picked it up from the ground, never pointed the gun at Davis, and continued running away" (JA324). A second dispute concerns the purpose and manner in which J.R. subsequently turned his head immediately before Davis fatally shot him: It was undisputed that J.R. "turned his head" but "dispute[d] why he turned his head and whether [that] movement rendered Davis's response reasonable or excessive under the circumstances." JA371. In all, the district court found there to be "no undisputed evidence that J.R." made *any* "threatening movements." JA375. Thus, while it was undisputed that J.R. possessed a firearm and that he ignored Davis's repeated commands to stop running, get on the ground, and show his hands (JA370), taking all the evidence in the light most favorable to Plaintiff, "a reasonable jury could conclude that a reasonable officer in Davis's place would not have believed J.R. to pose an immediate threat to his safety" (JA376). *Cf. Aleman v. City of Charlotte*, 80 F.4th 264, 293 (4th Cir. 2023) (where "a reasonable jury could review and interpret the video footage, consider the other evidence, and decide that [the victim] did not pose an immediate threat to [the officer] or anyone else at the moment [the officer] shot him," there is a genuine dispute of material fact on an excessive force claim).

Davis's arguments on appeal thus boil down to a disagreement with the district court's assessment of the record evidence. *All* of Davis's arguments are premised on the record showing that J.R., while crouching, pulled out a gun and looked at Davis in a way that a reasonable officer would find immediately threatening—an interpretation of the record that is irreconcilable with the district court's. *Nowhere* does Davis argue that he is still entitled to qualified immunity as a matter of law on the facts as the district court gave them, viewed in the light most favorable to Plaintiff: that, even if J.R. slipped as he ran away in fear from the aggressive police officer who was inexplicably chasing him, never pointed a gun at Davis, never made any threatening or furtive movement with the gun, and merely turned his head to look behind him as he continued to flee, Davis was nonetheless entitled to qualified immunity for his use of deadly force. In this interlocutory posture, that is the only argument this Court has jurisdiction to consider.

Because the Court lacks jurisdiction over any of the arguments Davis makes on appeal, this appeal should be dismissed.

## II. THE DISTRICT COURT PROPERLY DENIED QUALIFIED IMMUNITY.

Alternatively, to the extent that the Court has jurisdiction over any of the arguments Davis makes on appeal, none of those arguments has merit. The district court properly denied Davis qualified immunity because (1) the

facts, taken in the light most favorable to Plaintiff, establish that Davis violated a constitutional right and (2) that right was clearly established. *See Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016).[5]

### A. Davis's objectively unreasonable use of deadly force violated J.R.'s Fourth Amendment right.

A claim that a police officer employed excessive force in violation of the Fourth Amendment is analyzed under an "objective reasonableness" standard. *Henry*, 652 F.3d at 531. In considering the reasonableness of an officer's use of force, "a court must focus on the moment that the force is employed." *Id.* "The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Lewis*, 98 F.4th at 531. This inquiry considers "the totality of the circumstances" (*Hensley v. Price*, 876 F.3d 573, 582 (4th Cir. 2017)), including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Yates*, 817 F.3d at 885 (quoting *Graham*, 490 U.S. at 396). Among

---

[5] Plaintiff acknowledges that this Court is bound by Supreme Court and Fourth Circuit precedent holding that officers possess a defense of qualified immunity against Section 1983 claims. *See McMellon v. United States*, 387 F.3d 329, 332-333 (4th Cir. 2004). Nonetheless, Plaintiff preserves for later review the argument that the Court should overrule or recalibrate the doctrine of qualified immunity.

these factors, the second—whether the suspect poses an immediate threat to the safety of officers or others—is "the most important." *Lewis*, 98 F.4th at 531.

**1.** Davis's use of deadly force against J.R. was objectively unreasonable under *Graham* and *Garner*. As the district court recognized (JA375-376), taking the record in the light most favorable to Plaintiff, a reasonable officer in Davis's shoes would have lacked a reasonable basis (much less probable cause) to believe J.R. was an immediate threat to Davis or others. J.R. was *running away* from Davis (JA376; *see also* JA129 at 00:32–00:35; JA129 at 00:29–00:39), who had aggressively initiated the encounter without any reasonable suspicion of wrongdoing (JA309), nobody else was around (JA150 at 03:00–03:45), and J.R. had not pointed the gun or made any sort of furtive or threatening movement with it (JA375; *see also* JA327-328). There was no threat whatsoever that would have justified the use of deadly force.

The second—and most important—*Graham* factor cuts decisively in Plaintiff's favor. J.R., though armed, did not pose an immediate threat to Davis or anyone else. This Court has "repeatedly ruled that it was not objectively reasonable for officers to fire on suspects who, though armed, were not threatening the officers or others with their weapons at the moment they were shot." *Aleman*, 80 F.4th at 287; *see also, e.g.*, *Cooper v. Sheehan*, 735 F.3d 153, 159-160 (4th Cir. 2013) (although suspect "wielded a shotgun

in plain view," officers had no "information suggesting that [he] might harm them"; "the shotgun was real, but … the threat was not"); *Hensley*, 876 F.3d at 583 (suspect "never raised the gun to the officers" and "never otherwise threatened them"); *Betton v. Belue*, 942 F.3d 184, 192 (4th Cir. 2019) (suspect "was holding a firearm 'down'" by his hip); *Knibbs*, 30 F.4th at 217 (suspect was "holding a loaded shotgun that was not aimed at [the officer]" and had not "made any furtive movement towards [the officer] that would indicate his intent to cause physical harm"); *Franklin v. City of Charlotte*, 64 F.4th 519, 533-534 (4th Cir. 2023) (suspect "pointed [his handgun] at no one" and "would have had to reposition his grip to become a threat"). Other circuits agree. *See, e.g.*, *Cole v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) ("an individual's mere possession of a firearm is not enough for an officer to have probable cause to believe that individual poses an immediate threat of death or serious bodily injury; the suspect must also point the firearm at another individual or take similar menacing action"); *Cole v. Carson*, 935 F.3d 444, 453-454 (5th Cir. 2019) (en banc) (no qualified immunity where teenager "who was pointing a gun the entire time at his own head … posed no threat to the officers or others to support firing without warning"); *George v. Morris*, 736 F.3d 829, 833-834, 838 (9th Cir. 2013) (no qualified immunity where person held gun but did not take any action that would have been objectively threatening).

This is plainly a case where the gun was real but the threat was not. *Cooper*, 735 F.3d at 160. As the video evidence shows, J.R. was sprinting away from Davis—desperately trying to *avoid* him, not engage him. JA150 at 3:33–3:37. As in *Aleman*, although J.R. held the pistol in his hand and, in theory, "could have fired" it, "he could not have done so accurately" while running at top speed away from Davis. *Aleman*, 80 F.4th at 285. And as with the armed individuals in *Hensley*, *Betton*, *Knibbs*, and *Franklin*, J.R. made no threatening remarks or gestures to Davis or anyone else (JA375); indeed, there were no bystanders at all.

Turning to the third *Graham* factor—whether the suspect is attempting to evade arrest by flight—the fact that J.R. was fleeing from Davis in disregard of his orders to "stop running," "get on the ground," and show his hands does not make Davis's use of deadly force any less unreasonable. "A police officer who shoots a fleeing suspect without 'probable cause to believe that the suspect poses a significant threat of death or serious injury to the officer or others' violates that suspect's Fourth Amendment rights." *Henry*, 652 F.3d at 532 (quoting *Garner*, 471 U.S. at 3). Here, Davis not only lacked such probable cause—he also lacked *any* probable cause, or even reasonable suspicion, for seeking to arrest or stop J.R. in the first place. *See* JA309. Under South Carolina law, "a person has a right to resist an unlawful arrest." *State v. McGowan*, 557 S.E.2d 657, 622 (S.C. 2001). J.R.'s refusal to

obey Davis's unlawful orders therefore should not be held against him in the totality-of-the-circumstances analysis. What's more, Davis never gave J.R. a warning, or even ordered J.R. to drop his weapon, before starting to shoot. *See Garner*, 471 U.S. at 11-12; *Hensley*, 876 F.3d at 584 ("Before an officer may use deadly force, he should give a warning if it is feasible."). As this Court has recognized, even when circumstances are "tense and fast moving," officers' failure to "warn[] that they would shoot" "weighs against them" in the reasonableness analysis. *Hensley*, 876 F.3d at 584. Here, there is no reason why Davis could not have issued such a warning—if he had, tragedy could well have been avoided. If anything, J.R.'s flight provided even *more* opportunity for a warning than the officers had in *Hensley*. *See id.* at 578. An armed individual who is walking toward an officer could quickly take aim and fire. By contrast, a person running at full tilt *away* from the officer would have to first stop and turn around before he would present a similar threat. *Cf. Aleman*, 80 F.4th at 290 ("Although he could have fired the pistol while holding it in that position, he could not have done so accurately.").

As for the first *Graham* factor—the severity of the crime at issue—the district court appropriately found that this factor was not "germane" to the excessive force analysis because Davis's use of force against J.R. was unrelated to his investigation of reports of teenagers riding bikes and looking in

cars. JA322 (quoting *Knibbs*, 30 F.4th at 215). As in *Knibbs*, what prompted Davis to start shooting at J.R. was seeing the gun in his hand—an occurrence "unrelated to the original reason that he approached" J.R. 30 F.4th at 215.

In all, viewing the facts in the light most favorable to Plaintiff, the constitutional violation is straightforward. Because J.R. did not pose any immediate threat and the other *Graham* factors either weigh in Plaintiff's favor or do not move the needle, Davis's use of deadly force was objectively unreasonable and thus violated J.R.'s Fourth Amendment right.

**2.** Nothing in Davis's brief calls that conclusion into question.

**a.** To start with, the line of cases involving "furtive or other threatening movement with [a] weapon" (*e.g.*, *Benton v. Layton*, 139 F.4th 281 (4th Cir. 2025), *see* Br. 19-21) are wholly inapplicable here, where the district court found that a jury could reasonably conclude that J.R. made *no* such movement. JA371; JA375-376. In *Benton*, the suspect was in his car, which he had just run off the road after "making a U-turn across two lanes of traffic" as part of a reckless nighttime high-speed chase on a highway. 139 F.4th at 286, 290. As two officers approached the car, they ordered the suspect to show his hands outside the car. *Id.* at 286. In response to the commands, the suspect put his left arm out of the front driver's side window but kept his right hand in the vehicle. *Id.* The suspect then "quickly pulled his left

29

arm inside the vehicle," and, a moment later, one of the officers believed he spotted a gun inside the car (which, in fact, there was) and then saw the suspect "making movements around the center console and obscured passenger side of his vehicle." *Id.* at 286-287. In response, both officers fired. *Id.* at 287. Under those undisputed facts, this Court held that the officers' use of force was justified because they "reasonably feared they were in imminent danger" due to the suspect's "sudden" "furtive movements" following their clear orders. *Id.* at 291.

*Benton* further recognized and distinguished the "line of cases where a firearm was present, but officers were found to have had no objectively reasonable belief that the suspects were dangerous" because "[i]n those cases"—unlike in *Benton*, but as with J.R.—"the suspects were holding the weapons in nonthreatening ways *and* did not make movements that could reasonably be perceived as dangerous." *Id.* at 292 (citing *Cooper*, 735 F.3d at 159-160; *Hensley*, 876 F.3d at 585; *Aleman*, 80 F.4th at 292-293, 296; and *Franklin*, 64 F.4th at 535).

The three other "furtive movement" cases Davis cites (Br. 20) are likewise inapposite. In *Slattery v. Rizzo*, the suspect—also approached while sitting in a car, in this case in a parking lot notorious as an open-air drug market where a drive-by shooting had recently occurred—failed to respond to the officer's order to raise his hands, then "turned his entire upper body"

30

toward the officer while his far hand "appeared to be partially closed around an object." 939 F.2d 213, 214-215 (4th Cir. 1991). The officer, who had opened the suspect's car door and stood right outside the car, believed that the suspect was "coming at him with a weapon" and shot him. *Id.* at 215. Under those undisputed facts, this Court found that "a reasonable officer could have had probable cause to believe that [the suspect] posed a deadly threat and therefore would be authorized to use deadly force." *Id.* at 216-217.

In *Elliott v. Leavitt*, while the suspect was sitting in the front passenger seat of a police vehicle and two officers were standing immediately outside the passenger side of the vehicle having a conversation, one officer "noticed a movement and looked to find [the suspect] with his finger on the trigger of a small handgun pointed at" both officers. 99 F.3d 640, 642 (4th Cir. 1996). The officers shot the suspect after giving him a clear command to drop the weapon. *Id.*

And in *Anderson v. Russell*, the suspect was shot after he disregarded an order to put his hands up and instead "lower[ed] his hands in the direction of [a] bulge" "consistent with the shape of a gun" under his sweater by his waist. 247 F.3d 125, 130 (4th Cir. 2001). In each of these cases, the suspect *made a movement* that would have given a reasonable officer probable

31

cause to believe that the suspect posed an immediate deadly threat.[6] Here, by contrast, the district court found it to be genuinely disputed whether J.R. made any such threatening movement at all—if he didn't (which a jury must decide), then Davis did not act reasonably by using deadly force.

**b.** Davis's brief focuses exclusively on the threat Davis could have perceived at the time J.R. appeared to be "crouched" (Br. 22). Even setting aside Davis's misstatement of the facts (*see supra* at 20-21), Davis's argument is not directed to the relevant time: "the moment that the force is employed." *Henry*, 652 F.3d at 531. The video evidence shows that Davis did not begin shooting at J.R. until J.R. had already stood back up and continued running away—and *kept shooting* as J.R. fled from him across the empty parking lot. JA129 at 00:29-00:30; JA150 at 03:30–03:38. *See Aleman*, 80 F.4th at 285-286 (recognizing that reasonableness "must focus on the moment that deadly force was used, not the whole episode, and … that the justification

---

[6] Davis also cites two inapposite out-of-circuit cases (Br. 21-22), one involving an armed suspect who ran *at* the officer (*Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 366-367 (6th Cir. 2017)) and another where "the undisputed manner in which [the suspect] was holding the [shotgun] combined with the short distance between himself and the officers" would allow "any reasonable police officer [to] believe that [the suspect] posed a serious physical threat that required a use of deadly force" (*Thornton v. City of Columbus*, 727 F. App'x 829, 837 (6th Cir. 2018)). Notably, Davis has not identified a *single* case—even outside this circuit—holding that an officer could reasonably believe an individual running *away* from him to be an immediate threat merely because he was holding a gun and disregarding orders.

for deadly force can fall away in seconds"). The threat (if any) that a reasonable officer might have perceived from J.R. momentarily appearing to be "crouched" melted away when J.R. began running again—clearly, J.R. was seeking to *avoid* a confrontation with Davis, not to "initiate[]" a "gun battle" (as Davis put it in his summary judgment motion, JA075, despite the fact that J.R. never raised his pistol or fired a single shot). Comparably, in *Aleman*, this Court held that officers lacked probable cause to believe that even an armed and apparently delusional person posed "an 'immediate threat' such that deadly force could constitutionally be used against him" when—at the moment he was shot—he "was standing still in a position of surrender." 80 F.4th at 291-292.

**c.** As the district court correctly found, the fact that Davis claimed in his written statement that he recalled "hearing gunshots" after he saw J.R. "crouch" (JA328) does not change the calculus. The undisputed forensic evidence shows that no shots were fired by J.R.'s gun. *Id.* A jury therefore could conclude either that Davis's testimony was not credible (particularly in view of his other credibility problems, *see* JA328) or that, under the circumstances, even if he mistook his *own* gunshots for shots fired by J.R., such a mistake was not reasonable. *See Franklin*, 64 F.4th at 532 (if an officer acted based on a mistake, "the question is whether [that] mistake is *reasonable*").

**d.** Finally, with respect to the first *Graham* factor, Davis contends that an objectively reasonable officer in Davis's position would have had probable cause to investigate a laundry list of crimes, from misdemeanor tampering with an automobile in violation of S.C. Code Ann. § 16-21-90 to felony brandishing, displaying, or threatening others with a firearm on school property in violation of S.C. Code Ann. § 16-23-420(B). *See* Br. 17.

At the outset, Davis does not dispute that the second *Graham* factor— immediate threat—is "the most important" (Br. 19). Even if the first *Graham* factor did weigh in Davis's favor, it could not outweigh the second factor. Davis makes no argument to the contrary.

Davis also is wrong that there was probable cause (or even reasonable suspicion) to investigate each of these crimes.

Start with misdemeanor tampering of an automobile. Davis went to the neighborhood in response to a report of teenagers on bicycles looking in cars. Nothing about J.R. other than his age fit that description, and that of course is not enough. *See, e.g.*, *U.S. ex rel. Wright v. Cuyler*, 563 F.2d 627, 630 (3d Cir. 1997) ("[i]t is obvious that race and age alone … do not furnish probable cause"). When Davis encountered J.R., he was walking down a sidewalk minding his own business. He did not have a bicycle, and he certainly was not looking into cars.

Davis also lacked reasonable suspicion to believe that J.R. was "violating the curfew in Governor McMaster's COVID Pandemic Executive Order 2020-21." Br. 17. That Executive Order provided several exceptions for "Essential Activities," including engaging in outdoor exercise or recreational activities, visiting a family member in another residence, obtaining necessary supplies and services, and attending religious services. *See* JA213-214. From Davis's observation of J.R. walking alone down the sidewalk, he had no reason to suspect that J.R. was not engaging in a permissible "essential activity."

Because Davis lacked reasonable suspicion or probable cause to stop or arrest J.R. in the first place, he also lacked probable cause to investigate J.R. for "failing to stop for a police command" (Br. 17). *See McGowan*, 557 S.E.2d at 622 (under South Carolina law, "a person has a right to resist an unlawful arrest"); *see also* S.C. Code Ann. § 16-7-10 (making it unlawful to "willfully fail or refuse to comply with any *lawful* order or direction of any law enforcement officer") (emphasis added).

As for unlawful carrying of a handgun in violation of S.C. Code Ann. § 16-23-20, that statute makes it unlawful to carry a handgun only in certain places (for example, courthouses, daycare facilities, or polling places on election days), none of which describe the streets or parking lot where J.R. was.

In any event, even if there was probable cause to believe that J.R. violated any criminal statute by being seen with a gun on school property or by appearing to possess a firearm while being under age 18, the "totality of the circumstances" (*Hensley*, 876 F.3d at 582) shows that any crime was nonetheless not severe, stemmed from Davis's own unlawful conduct, and simply recapitulates the undisputed fact that J.R. held a gun. J.R. never "brandish[ed]," "point[ed]," or "threaten[ed]" anyone with the gun (Br. 17)—he only held it in his hand, outside and with nobody around. And, importantly, J.R. entered the school parking lot and was holding the gun only because Davis aggressively and unlawfully sought to arrest or stop him based on *zero* reasonable suspicion of wrongdoing. *See Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (in "totality of the circumstances" inquiry, "[t]he history of the interaction" is informative). Ultimately, the criminal statutes Davis cites offer "limited probative guidance" (*Knibbs*, 30 F.4th at 216) and are redundant of the undisputed fact that J.R. held a gun. *See Franklin*, 64 F.4th at 535 (that the officer "may have had cause to believe [the suspect] used or possessed his firearm unlawfully" does not change the analysis; qualified immunity denied); *Hensley*, 876 F.3d at 578, 582 (affirming denial of qualified immunity where officers witnessed unlawful use of firearm).

### B. The constitutional right was clearly established.

The district court determined that a jury could find that J.R. did not make any furtive movement (JA371) and therefore "could conclude that a reasonable officer in Davis's place would not have believed J.R. to pose an immediate threat to his safety" (JA376). Under this assessment of the record evidence, Davis's use of deadly force violated clearly established law prohibiting the use of deadly force against an individual who is armed but has not pointed the weapon or otherwise made a furtive or threatening movement. Davis has presented no substantial argument to the contrary, either in the district court or on appeal.

**1.** A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Estate of Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 907 (4th Cir. 2016) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). This Court "do[es] not require a case directly on point" to make this showing. *Smith*, 781 F.3d at 100. Rather, the question is whether existing precedent provides "fair warning" that certain conduct is unlawful. *Tarashuk v. Givens*, 53 F.4th 154, 164-166 (4th Cir. 2022).

**2.** As the district court recognized, the Fourth Circuit has "a split burden of proof for the qualified-immunity defense": if the plaintiff shows that

a constitutional violation occurred, the officer "bears the burden on the second prong"—that is, showing that the violation was not of a clearly established constitutional right. *Stanton*, 25 F.4th at 233.

The right here was clearly established at the time Davis shot and killed J.R. in 2020. This Court has held that years earlier—in 2013—it was clearly established that "simply being armed is insufficient to justify deadly force." *Estate of Jones*, 961 F.3d at 670 (citing *Henry*, 652 F.3d at 534, as supporting the proposition that "shooting a 'fleeing, nonthreatening misdemeanant' was unlawful, even when that suspect had a firearm"). And by 2020, the contours of that right had been established with even greater specificity: it was clearly established that an officer cannot lawfully use deadly force against an individual who is armed but does not pose an immediate threat, whether by pointing the weapon or otherwise making a furtive or threatening movement. *See Hensley*, 876 F.3d at 582 (holding, in 2017, that deadly force was unconstitutional where the individual, though holding a gun, "never raised his weapon toward the [officers]" and "was not immediately threatening to anyone at scene"); *see also, e.g.*, *Cooper*, 735 F.3d at 159-160 (in a case where the individual who was shot was holding a gun, holding that "the right to be free from deadly force when posing no threat" was clearly established in 2007); *Betton*, 942 F.3d at 191 (recognizing in 2019

that, where an individual possesses a firearm, "an officer must make a reasonable assessment that he, or another, has been *threatened* with a weapon, in order to justify the use of deadly force").

*Franklin* is particularly instructive. *See* 64 F.4th at 534-535. There, this Court held that it was clearly established in 2019 that "carrying a weapon, without more, does not justify an officer's choice to shoot" and applied that rule to an officer's shooting of an armed individual in a Burger King parking lot whom the officer "may have had cause to believe … used or possessed his firearm unlawfully." *Id.* Those facts are strikingly similar to the circumstances here.

In addition to this Court's controlling cases, multiple other circuits agree that "an individual's mere possession of a firearm is not enough for an officer to have probable cause to believe that individual poses an immediate threat of death or serious bodily injury; the suspect must also point the firearm at another individual or take similar menacing action." *Cole v. Hutchins*, 959 F.3d at 1132 (Eighth Circuit); *Cole v. Carson*, 935 F.3d at 453-454 (Fifth Circuit; it was clearly established in 2010 that use of deadly force without warning is not permissible against an armed individual who posed no threat to the officers or others); *George*, 736 F.3d at 838 (Ninth Circuit; use of armed force was unconstitutionally excessive where person

held gun but did not take any action that would have been objectively threatening).

It is equally clear that J.R.'s flight in disregard of Davis's commands does not muddy the water. As this Court recognized in *Knibbs*, by 2018, it was "clearly establish[ed] that the failure to obey commands by a person in possession of, or suspected to be in possession of a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person." 30 F.4th at 225. And, of course, it has been clear since *Garner* that preventing the escape of a fleeing suspect does not justify the use of deadly force. 471 U.S. at 20-21.

All these cases gave Davis ample "fair warning" (*Tarashuk*, 53 F.4th at 165) that he could not shoot J.R. just because he was holding a gun and running away.

**3.** Davis offers no substantial legal argument in response.

As he does throughout his brief, Davis disputes the district court's determination that "a reasonable jury could conclude that a reasonable officer in Davis's place would not have believed J.R. to pose an immediate threat to his safety." JA376. *See* Br. 24 (contending that Davis "objectively perceived an immediate danger when J.R. failed to follow his clear commands,

was visibly holding a handgun firmly in his control, crouched down and turned his head towards Officer Davis"). But again, this Court cannot revisit the district court's assessment of the evidence, which concluded that a jury could find that J.R. did *not* make any "furtive or threatening movement with the weapon." JA371.

The only other response Davis makes is to invoke this Court's statement in *Benton v. Layton* that "the 'furtive movement' cases hold that officers may deploy lethal force when, after issuing clear commands, they reasonably perceive a suspect to be an immediate danger because of movements in violation of those commands." 139 F.4th at 293. Again, that case law has no bearing here, where a jury could find that J.R. did *not* make any furtive movement (JA371) and therefore "could conclude that a reasonable officer in Davis's place would *not* have believed J.R. to pose an immediate threat to his safety" (JA376 (emphasis added)).

## CONCLUSION

The Court should dismiss the jurisdictionally barred arguments and otherwise affirm the district court's order denying qualified immunity.

41

Dated: September 15, 2025      Respectfully submitted,

/s/ *Mary H. Schnoor*

JUSTIN T. BAMBERG          PAUL W. HUGHES

ADAM C. NESS             MARY H. SCHNOOR

  *Bamberg Legal, LLC*      *McDermott Will & Schulte LLP*

  *104 Bridge Street*        *500 North Capitol Street NW*

  *Bamberg, SC 29003*      *Washington, DC 20001*

  *(803) 956-5088*          *(202) 756-8000*

*Counsel for Plaintiff-Appellee Brittany Ruffin, individually and as Personal Representative for the Estate of J.R.*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7) because it contains 9,848 words, excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 MSO and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: September 15, 2025 _/s/ Mary H. Schnoor_

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2025, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: September 15, 2025          /s/ *Mary H. Schnoor*